GIRARDI | KEESE
1 THOMAS V. GIRARDI, CA Bar No. 36603
tgirardi@girardikeese.com
2 GRAHAM B. LIPPSMITH, CA Bar No. 221984
glippsmith@girardikeese.com
3 1126 Wilshire Boulevard
Los Angeles, California 90017-1904
4 Telephone: (213) 977-0211 - Facsimile: (213) 481-1554

5 CALDWELL, LESLIE, PROCTOR & PETTIT
A Professional Corporation
6 CHRISTOPHER G. CALDWELL, CA Bar No. 106790
caldwell@caldwell-leslie.com
7 ANDREW ESBENSHADE, CA Bar No. 202301
esbenshade@caldwell-leslie.com
8 JEANNE A. FUGATE, CA Bar No. 236341
fugate@caldwell-leslie.com
9 ALBERT GIANG, CA Bar No. 224332
giang@caldwell-leslie.com
10 1000 Wilshire Boulevard, Suite 600
Los Angeles, California 90017-2463
11 Telephone: (213) 629-9040 - Facsimile: (213) 629-9022

12 Attorneys for Plaintiffs RALPH GONZALES, ALISA KING, JEFFREY KING,
13 EMMETT S. ELLIOTT, JR. and the PUTATIVE CLASS

ORIGINAL

FILED
CLERK, U.S. DISTRICT COURT

OCT 25 2006

CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

√ SCAN ONLY

CLERK, U.S. DISTRICT
OCT 2 0 2006
CENTRAL DISTRICT OF CALIFORNIA

14
15

### UNITED STATES DISTRICT COURT

### CENTRAL DISTRICT OF CALIFORNIA

16
17 RALPH GONZALES, ALISA KING, JEFFREY KING, and EMMETT S.
18 ELLIOTT, JR., in Their Individual and Representative Capacities on Behalf of
19 a Class of All Persons similarly situated,

        Plaintiffs,

20 v.

21 LLOYDS TSB BANK, plc, a foreign company; MAN FINANCIAL
22 LIMITED, aka MAN FINANCIAL, a foreign company; KAPLAN,
23 SWICKER, & SIMHA ACCOUNTANCY CORPORATION, a
24 California Corporation; and DOES 1 through 10, inclusive,
25
26         Defendants.

CASE NO. CV 06-1433-DSF (JTLx)

The Honorable Dale S. Fischer

[PROPOSED] FOURTH AMENDED CLASS ACTION COMPLAINT;

DEMAND FOR JURY TRIAL

COUNTS:

I.   AIDING AND ABETTING BREACH OF FIDUCIARY DUTY;
II.   AIDING AND ABETTING FRAUD;
III.  VIOLATION OF CALIFORNIA BUSINESS PROFESSIONS CODE § 17200 *ET SEQ.*;
IV.  VIOLATION OF 18 U.S.C. § 1961 *ET SEQ.* (RICO);
V.   CIVIL CONSPIRACY

DOCKETED ON CM

OCT 27 2006

BY _____ 145

27
28

Plaintiffs Ralph Gonzales, Alisa King, Jeffrey King, and Emmett S. Elliott, Jr., in their individual and representative capacities and on behalf of the class of all persons similarly situated, by their undersigned attorneys allege for their Complaint as follows:

## INTRODUCTORY STATEMENT

1.      Zvi Leichner and Moshe Leichner (the "Leichners") are the masterminds behind a Ponzi scheme that allowed them to bilk victims out of tens of millions of dollars. But they couldn't have executed their scheme without the complicity and help of the Defendants.

2.      Defendant Lloyds TSB Bank plc ("Lloyds") allowed the Leichners to commingle their victims' assets within several Lloyds accounts, was instrumental in lulling investors into a false sense of security by wiring purported "profits" to them, transferred the Leichners' ill-gotten gains to other corporate entities and offshore accounts, and gave the Leichners the aura of legitimacy that they needed to continue to fool their victims. Defendant Man Financial Limited ("Man Financial"), meanwhile, was instrumental in assisting the Leichners to move the victims' funds to an account in Barbados, and by deliberately not registering these transfers on the account statements sent to the Leichners. Man Financial, as a legitimate broker in the foreign currency trade, also bolstered the Leichners' credibility. Finally, the Leichners' accountants, Kaplan, Swicker & Simha Accountancy Corporation ("Kaplan"), were privy to all of the Leichners' business dealings and financial statements and so were well aware of the Ponzi scheme by the fall of 2001, yet created fraudulent financial statements to hide the true nature of the Leichners' "business" rather than lose a steady stream of income generated by "auditing" the Leichners' various entities. Kaplan also convinced at least one individual, who represented a group of investors, to keep money invested on behalf of the group of investors with the Leichners by speaking directly with that representative's accountant. After this conversation, the representative not only

-1-

agreed *not* to withdraw the several million already invested, but also wired approximately $38 million more to the Leichners' account at Lloyds on behalf of the group of investors.

3.     None of these Defendants supported the Leichners' scheme for free. Each of the Defendants, motivated by profits and the opportunity to continue to line its own pockets, knowingly assisted a massive financial scam, the results of which have caused enormous financial hardship. Lloyds and Man Financial earned what is believed to be millions of dollars working side-by-side with the Leichners. Kaplan became the "go to" accounting firm for all of the Leichners' myriad businesses and earned hefty fees as a result.

4.     The Leichners have filed for bankruptcy and are in jail for what they did. Plaintiffs bring this action to hold the Defendants accountable for the devastating harm they helped cause. That harm is believed to exceed $90,000,000. Plaintiffs also seek an award of punitive damages against each of the Defendants.

## **PARTIES**

5.     Plaintiff Ralph Gonzales is an individual residing in El Dorado County, California.

6.     Plaintiffs Alisa and Jeffrey King are married individuals residing in Snohomish County, Washington.

7.     Plaintiff Emmett S. Elliott, Jr. is an individual residing in Montgomery County, Alabama.

8.     Defendant Lloyds TSB Bank plc ("Lloyds") is a company formed under the laws of a foreign state. The head office of Lloyds is located in London, England. Lloyds is a full-service bank that offers a number of services, including the business banking service utilized by the Leichners and discussed in greater detail below.

Fourth Amended Complaint - final.doc

[PROPOSED] FOURTH AMENDED CLASS ACTION COMPLAINT

9. Defendant Man Financial Limited, also known as Man Financial Corporation and Man Financial, Inc., ("Man Financial") is a company formed under the laws of a foreign state. Plaintiffs are informed and believe and thereupon allege that Defendant Man Financial is a division of Man Group plc, a company formed under the laws of a foreign state. The head office of Man Financial is in London, England. Man Financial is a brokerage firm and acts as an independent market maker in foreign exchange and precious metals, and as a broker in futures.

10. Defendant Kaplan, Swicker & Simha Accountancy Corporation ("Kaplan"), formerly known as Kaplan & Swicker, is an accountancy corporation organized and existing under the laws of California. Kaplan provided accounting and tax services to one or more of the corporations created by the Leichners to implement and further their Ponzi scheme, including but not limited to Midland Euro, Inc. and Midland Euro Exchange, Inc. (collectively the "Midland Entities"), prior to their bankruptcy filing. Kaplan also provided accounting services to affiliates of the Midland Entities, including Bonanza Realty, Inc. and American Realty Group, Inc., which were funded at least in part by the proceeds of the Ponzi scheme.

11. The true names and capacities of Defendants DOES ONE through TEN are unknown to Plaintiffs, and Plaintiffs will seek leave of court to amend this complaint to allege such names and capacities as soon as they are ascertained.

## VENUE

12. Plaintiffs filed this action in Los Angeles Superior Court, where venue was proper under Section 395 of the California Code of Civil Procedure because Defendant Kaplan is a corporation or unincorporated association and its principal place of business is in the County of Los Angeles, and because this action is based on conduct which took place within the County of Los Angeles.

Fourth Amended Complaint - final.doc    [PROPOSED] FOURTH AMENDED CLASS ACTION COMPLAINT

1   Defendants have since removed the action from Los Angeles Superior Court to the

2   Central District of California.

3       13.    Venue is proper in this Court under 28 U.S.C. § 1391(a)(1) because

4   Defendant Kaplan is a corporation or unincorporated association and its principal

5   place of business is in the Central District of California, and because Defendants

6   Lloyds and Man Financial are deemed to reside in the Central District of

7   California pursuant to 28 U.S.C. § 1391(c).  Venue is also proper under 28 U.S.C.

8   § 1391(a)(2) because a substantial part of the events or omissions giving rise to the

9   claim occurred in the Central District of California.

10

11   ## CLASS ACTION ALLEGATIONS

12       14.    Pursuant to Rule 23(a) and Rule 23(b)(3) of the Federal Rules of

13   Civil Procedure, Plaintiffs bring this action on behalf of themselves and as

14   representatives of all others who are similarly situated and who fall within the

15   following class definition:  All individuals or entities that lost money invested

16   with any of the Midland Entities for foreign currency trading.  For purposes of this

17   class definition, an individual or entity "lost money" only if the amount of

18   money that the individual or entity received from the Midland Entities, including

19   any return on investment, commissions, fees or any other payments, was less than

20   the amount of the individual's or entity's money invested with the Midland

21   Entities.  An individual's or entity's money is considered "invested with" a

22   Midland Entity regardless of whether it was invested through a broker, fund,

23   partnership, corporation, investment group or any other similar vehicle.  Similarly,

24   money is considered "received from" a Midland Entity if it originated with a

25   Midland Entity, even if it came to the individual or entity through a broker, fund,

26   partnership, corporation, investment group or any other similar vehicle.  The class

27   shall comprise the individual investors, and not any intermediate brokers, funds,

28   partnerships, corporations, investment groups or any other similar vehicles.

-4-

15.     Those individuals and entities are putative "Class Members."  The "Class Representatives" are Ralph Gonzales, Alisa King, Jeffrey King, and Emmett S. Elliott Jr., who each fall within the definition of a Class Member.

16.     The Class Members are so numerous and geographically diverse that joinder is impracticable.  There are more than 300 class members spread throughout the world.

17.     The Class Representatives will fairly, adequately, and vigorously represent the interests of the Class.  Furthermore, each of the Class Representatives is highly motivated to prosecute this action:

    a.     Mr. Gonzales was lured into investing almost all of his life's savings, approximately $130,000, with the Midland Entities and lost more than $70,000 of it.  Mr. Gonzales's life has been devastated by the Ponzi scheme.

    b.     Mr. and Mrs. King were lured into investing approximately $165,000 – money that they had set aside for the college educations of their five children – and lost approximately $158,000 of it.  Mrs. King had been able to stay at home with their children, but now faces the possibility of having to return to the workplace.

    c.     Mr. Elliott had just retired when he invested his nest egg of $225,000, of which he recovered just $12,000 in purported "profits" in the first few months after investing.  Mr. Elliott now works two jobs.  In addition to the financial hardship that he and his wife of 36 years are now facing, Mr. Eliott has been emotionally and psychologically devastated by this loss.

18.     Questions of law and fact common to all potential Class Members predominate over any questions affecting only individual Class Members.  Among the common questions of law and fact to the Class Members are:

Fourth Amended Complaint - final.doc

[PROPOSED] FOURTH AMENDED CLASS ACTION COMPLAINT

- Whether a fiduciary relationship existed between the Leichners or one or more of the Midland Entities and Class Members;
- Whether the Leichners or one or more of the Midland Entities breached a fiduciary duty to Class Members;
- Whether damages were caused by the breach of a fiduciary duty to Class Members by the Leichners or one or more of the Midland Entities;
- Whether the Defendants aided and abetted the breach of a fiduciary duty to Class Members by the Leichners or one or more of the Midland Entities;
- Whether the Defendants financially gained from aiding and abetting the breach of fiduciary duty by the Leichners or one or more of the Midland Entities;
- Whether the Leichners or one or more of the Midland Entities intentionally misrepresented material facts to Class Members;
- Whether the Leichners or one or more of the Midland Entities misrepresented material facts to induce reliance by Class Members;
- Whether the Leichners or one or more of the Midland Entities misrepresented material facts in order to deceive Class Members;
- Whether Class Members were justified in relying on the misrepresentations of material facts by the Leichners or one or more of the Midland Entities;
- Whether damages resulted from Class Members' justifiable reliance on the misrepresentation of material facts by the Leichners or one or more of the Midland Entities;

-6-

- Whether the Defendants knew of the fraudulent activities of the Leichners or one or more of the Midland Entities;
- Whether the Defendants actively assisted the fraudulent activities of the Leichners or one or more of the Midland Entities;
- Whether the Defendants substantially assisted and aided and abetted the Leichners' and the Midland Entities' breaches of fiduciary duty in violation of California common law and, therefore, engaged in unlawful business acts and practices under Cal. Bus. & Prof. Code §§ 17200 *et seq.*;
- Whether the Defendants substantially assisted and aided and abetted the Leichners' and the Midland Entities' fraud in violation of California common law and, therefore, engaged in unlawful business acts and practices under Cal. Bus. & Prof. Code §§ 17200 *et seq.*;
- Whether the Defendants knowingly and willfully conspired and agreed among themselves to form and operate, or later joined the ongoing conspiracy and fully ratified all past actions and the purpose of, the Ponzi scheme in violation of California common law and, therefore, engaged in unlawful business acts and practices under Cal. Bus. & Prof. Code §§ 17200 *et seq.*;
- Whether the Defendants participated, directly and indirectly, in the conduct of the affairs of the Midland Enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c) and, therefore, engaged in unlawful business acts and practices under Cal. Bus. & Prof. Code §§ 17200 *et seq.*;
- Whether the Defendants engaged in acts of mail and wire fraud in violation of 18 U.S.C. §§ 1341 & 1343 and, therefore,

-7-

engaged in unlawful business acts and practices under Cal. Bus. & Prof. Code §§ 17200 *et seq.*;

- Whether Kaplan issued a report that failed to conform to professional standards upon completion of its review and audit of the Midland Entities' financial statements in violation of Cal. Bus. & Prof. Code § 5062 and, therefore, engaged in unlawful business acts and practices under Cal. Bus. & Prof. Code §§ 17200 *et seq.*;

- Whether the Defendants' actions constituted fraudulent business acts or practices under Cal. Bus. & Prof. Code §§ 17200 *et seq.*;

- Whether the Defendants committed tortious acts with fraud, oppression or malice;

- Whether Lloyds, Man Financial, Kaplan, the Leichners, and the Midland Entities collectively constituted an "enterprise" within the meaning of that term as used in 18 U.S.C. § 1962(c);

- Whether the aforesaid enterprise engaged in interstate commerce and the activities of the enterprise affected interstate commerce;

- Whether each of the Defendants participated, directly and indirectly, in the conduct of the affairs of the aforesaid enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(c);

- Whether Defendants attempted to commit and committed acts of mail fraud, as that term is defined in 18 U.S.C. § 1341, and wire fraud, as that term is defined in 18 U.S.C. § 1343, on numerous occasions;

-8-

- Whether Defendants attempted to, conspired to and did affect commerce by said acts of mail fraud in violation of 18 U.S.C. § 1341 and wire fraud in violation of 18 U.S.C. § 1343; and

- Whether Defendants' continuous and repeated violations of 18 U.S.C. § 1341 and 18 U.S.C. § 1343 constitute a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

These common questions predominate over all Class Members' claims, including those of the Class Representatives. Indeed, there is essentially no difference between the Class Representatives' claims and the other Class Members' claims. As a result, the Class Representatives' claims are typical of, if not identical to, the rest of the Class Members' claims.

19.    Class action treatment is superior to the alternatives, if any, for the fair and efficient adjudication of the controversy alleged in this Complaint. Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without duplication. Separate trials adjudicating the liability of defendants will be inefficient, and will run the risk of producing inconsistent verdicts. Consolidating the litigation of all Class Members will enhance judicial economy and promote justice. Class treatment will also permit the adjudication of relatively small claims by many of the Class Members who could not individually afford to litigate the claims asserted in this Complaint. There are no difficulties that would preclude class action treatment of this lawsuit, and no superior alternative exists for the fair and efficient adjudication of this controversy.

20.    Concentrating the Class Members' claims in the Central District of California is preferable to maintaining this action in any other venue. This venue has a logical connection to the underlying events of this action, as it is where a lion's share of the actions underlying this suit occurred.

-9-

21.     The contemplated notice to the Class Members will be through direct mail to each Class Member.

## **GENERAL ALLEGATIONS**

### **The Genesis of the Ponzi scheme**

22.     In or around 1999, Zvi Leichner and Moshe Leichner set up two companies, Midland Euro Exchange, Inc. ("MEEI") and Midland Euro, Inc. ("MEI") purportedly to trade foreign currencies. These two companies were in fact part of the group of businesses, the Midland Entities, created by the Leichners to implement and further their Ponzi scheme.

23.     The Leichners, and other brokers the Leichners had recruited, met with potential investors, either in person or over the telephone. The Leichners told investors that they would be investing in foreign currencies which MEEI and MEI would trade, and investors typically were told that their investment would generate guaranteed monthly profits of between 2 and 4 percent. Investors were also told that a percentage of their initial investment – varying from 40 to 85 percent – was guaranteed against loss. The Midland Entities made similar misrepresentations in written literature mailed to investors.

24.     In fact, the foreign currency exchange market is extremely volatile and investing in the market carries a high level of risk, particularly when investments are in futures or options contracts. As with any futures trading, if the price of the currency moves in an unfavorable position, investors can lose their entire initial deposit and shoulder liability for additional losses. Given the unpredictable nature of the foreign currency exchange market, a currency exchange business that *guarantees* an initial investment or *promises* a profit every month is a common Ponzi scheme.

25.     The Leichners also mailed documents to investors touting the Midland Entities' relationship with Defendants. For instance, both Lloyds and

Kaplan are listed as MEI's "Due Diligence References." And the Leichners sent a letter to investors in June 2001 announcing that Lloyds was the latest "addition to our team," and that their so-called "new banking affiliate" had "pledged to give Midland Euro Exchange and its customers the highest possible level of responsiveness and dedication in all of our financial needs."

26.    Based on the Leichners' misrepresentations, more than 300 investors invested more than $135 million with the Leichners for investments in foreign currency between approximately July 2000 and December 2002. Although the Leichners promised investors that their money would be used only for trading foreign currency, less than 20 percent of investor funds were actually invested in foreign currency. The remainder of the investor funds were used by the Leichners and others to pay large sums to themselves and to purchase personal assets, including planes, automobiles and real property.

27.    The Leichners commingled investors' funds in accounts belonging to the Midland Entities and used the commingled funds to make payments (including but not limited to payments of fictitious profits) to other investors in the Midland Entities. The accounts utilized by the Midland Entities included accounts in the names of MEI and MEEI at Defendant Lloyds in England and Cathay Bank in Los Angeles County. The Leichners also diverted a portion of the commingled investor funds for the personal benefit of the Leichners and to pay other expenses.

28.    In order to lull investors by reassuring them that their investments were doing well and to dissuade them from investigating and uncovering the fraud, or from attempting to remove their money, the Midland Entities mailed monthly account statements to investors, showing profits on the purported investments. In fact, these statements were generated by arbitrarily assigning gains to clients' accounts.

[PROPOSED] FOURTH AMENDED CLASS ACTION COMPLAINT

29. These actions were typical of a Ponzi scheme.[1] In a Ponzi scheme, an operator or business claiming to be a legitimate business or investment solicits funds from investors promising a certain percentage return on a monthly basis. In actuality, the promoter of the scheme converts the funds to non-authorized uses, including paying purported profits to certain investors with the invested capital of other investors. In many instances, the operator incorporates and forms several businesses with the same or similar names to promote the Ponzi scheme, to mislead the investors, and to conceal the scheme from government regulatory and investigative agencies. In addition, to encourage new investors to invest in the scheme, and to give current investors the impression that the investment program is legitimate, the promoter will pay earlier investors purported "profits" from the investment program with the money provided by later investors. A Ponzi scheme is a *per se* fraudulent business practice.

**Two Regulatory Agencies Investigate and Suspend the Midland Entities**

30. The Midland Entities purported to trade in the Foreign Exchange market, which is also referred to as the FOREX, or FX, market. FOREX trade consists of the simultaneous buying of one currency and the selling of another. The Midland Entities also claimed to trade in foreign currency futures and options contracts.

31. Businesses that trade in futures are regulated by a government agency, the Commodity Futures Trading Commission (the "CFTC," or "Commission"), and an industry-sponsored watchdog group, the National Futures Association (the "NFA," or "Association").

---

[1] Ponzi schemes are a type of illegal pyramid scheme named for Charles Ponzi, who duped thousands of New England residents into investing in a postage stamp speculation scheme in the 1920s.

-12-

32.   Congress created the Commission in 1974 as an independent agency with the mandate to regulate commodity futures and option markets in the United States.  Among other tasks related to the futures market, the Commission works to protect market participants against manipulation, abusive trading practices, and fraud.

33.   On or about February 8, 2001, the CFTC published a Commission Advisory warning about fraudulent practices by foreign currency trading companies entitled "Beware of Foreign Currency Trading Frauds."  This warning was a public record and was published on the Internet.

34.   The same legislation that created the Commission authorized the creation of "registered futures associations," giving the futures industry the opportunity to create a nationwide self-regulatory organization.  The result was the NFA, which acts in partnership with the Commission and regulates every firm or individual who conducts futures trading business with public customers.  Membership in the Association is mandatory; currency exchange businesses cannot trade unless they are registered with the Association.

35.   The Association screens all firms and individuals wishing to do business with the public on any U.S. futures exchange.  The Association has adopted stringent rules covering a wide variety of areas, such as minimum capital requirements, and reporting and proficiency testing, and performs audits and examinations of members to monitor compliance with its rules.  The Association has the authority to take disciplinary action against any firm or individual who violates its rules, and may deny, revoke, suspend, restrict, or condition any firm's or individual's registration.

36.   In or around 2000, the Midland Entities merged into and/or purchased a corporation called DeLong, Friedman, & Sukenik, Inc. ("DFS"), which was an NFA member and a registered futures commission merchant ("FCM"), in order to obtain DFS's Association membership and FCM registration and thereby to obtain

a legitimate entity through which to operate their fraud. The Midland Entities paid to purchase DFS and, after the merger, one of the former owners of DFS, Howard Friedman, served as a consultant to the Midland Entities. Mr. Friedman wrote numerous memoranda to the Midland Entities, pointing out accounting and other significant problems with the way the Midland Entities were running the business that could cause them to lose their NFA membership and FCM registration. These memoranda were eventually forwarded to Kaplan.

37.    In January 2001, the NFA conducted an audit of the Midland Entities.[2] The Association requested that the Midland Entities produce a complete list of all of their customer accounts as of November 30, 2000, and that they produce bank statements for all accounts related to the firm and its operations. In response to the first request, the Midland Entities provided a list of 54 accounts, with a cumulative net liquidating value of $510,000. In response to the second request, the Midland Entities produced records relating to two accounts at Charles Schwab & Co.

38.    In October 2001, in response to a complaint from a fund whose investors invested in the Midland Entities, Al Baraka International Investment Company Ltd. ("Al Baraka"), the Association attempted to re-audit the Midland Entities' financial records and concluded that their books and records were in such disarray that they could not demonstrate that they met the Association's minimum capital requirements.

39.    On or about October 31, 2001, the Association suspended the Midland Entities' membership in the NFA. In NFA Administrative Proceeding No. 01-MRA-02, the Association ruled that the Midland Entities' immediate

---

[2] The audit and ensuing regulatory proceedings were in fact directed at MEI, which was the Midland Entity that was registered with the Association and Commission. For ease of reference, the description above shall refer collectively to the Midland Entities, rather than simply MEI, because MEI, MEEI, and the other Midland Entities were not operated as separate entities.

-14-

suspension was necessary to protect their customers. This proceeding was a matter of public record.

40.     This finding was based, in part, on the declaration of Sharon Pendleton, Team Manager of the Association's Compliance Department. Ms. Pendleton's declaration described false and/or deceitful financial conduct committed by the Midland Entities and their management. Ms. Pendleton concluded that the records provided to the Association by the Midland Entities in January 2001 were incomplete in that they had failed to disclose (1) two trading accounts in Al Baraka's name that were valued at somewhere between $4 million and $17 million, and (2) a bank account at Defendant Lloyds.

41.     On or about November 19, 2001, the Commission in turn announced in CFTC Docket No. SD02-01 that the Commission intended to suspend or restrict the Midland Entities' registration with the CFTC as a futures commission merchant on the basis of the NFA's findings. This proceeding was a matter of public record.

42.     During November 2001, both the Commission and the Association issued public press releases that described the regulatory actions taken by both organizations against the Midland Entities.

43.     In or around November 2001, Defendants Man Financial and Kaplan learned of these actions. Lloyds became aware of the actions no later than January 2002. Yet Defendants unabashedly continued their profitable business relationship with the Midland Entities and in so doing knowingly aided, abetted and perpetuated the Ponzi scheme.

**Lloyds Knowingly Furthered the Ponzi scheme by Commingling Investor Funds and Transferring the Money in Furtherance of the Scheme**

44.     The Leichners' scheme could not have succeeded if there was not a repository to which investors could send their funds and from which those funds

Fourth Amended Complaint - final.doc                    [PROPOSED] FOURTH AMENDED CLASS ACTION COMPLAINT

could be siphoned off for the Leichners' own purposes.  Lloyds served this role ably and with an added bonus: its almost 250-year-old venerable reputation added a veneer of respectability to the venture.

45.     In or around September 1999, the Midland Entities opened at least two accounts with Defendant Lloyds in the name of Midland Euro-Exchange, Inc. The two signatories were Zvi Leichner and Moshe Leichner.

46.     By June 2001, the Midland Entities had opened at least four accounts with Lloyds:  two in the name of Midland Euro, Inc. and two in the name of Midland Euro-Exchange, Inc.  In September 2001, the Midland Entities requested that the two accounts in the name of Midland Euro, Inc. be closed and the funds moved into the Midland Euro-Exchange, Inc. account.

47.     Individuals associated with the Midland Entities, including Moshe Leichner and the Midland Entities' counsel, Michael Cardenas, also held individual accounts with Lloyds.

48.     The Leichners have estimated that as much as 90 percent of all investor funds obtained by means of the Ponzi scheme – which could total as much as $121 million – was wired by investors directly into the Lloyds accounts.

49.     The Midland Entities' primary Lloyds account, which was an account maintained in U.S. dollars, had average balances of approximately $10 to $12 million, which means that Lloyds was responsible for wiring much of the commingled funds out of the account in aid of the Ponzi scheme.  For instance, during the relevant time period, commissions to the Midland Entities' sales force were paid out of the Lloyds account.  There were notations on the tops of wire transfer requests noting that they were for commissions.  In addition, the "profits" earned by investors were wired from the Lloyds account.

50.     Lloyds also wired money to offshore accounts belonging to the Leichners and their business associates.  For instance, on October 14, 2001, Lloyds transferred $2 million to two accounts held by Moshe Leichner in Israel.

-16-

Around that same time period, Lloyds transferred $3 million to a bank account in the name of the Midland Entities' attorney, Michael Cardenas. Over the next year, Cardenas received at least eight more transfers, totaling almost $2 million. Moshe Leichner's relatives, including his daughter and brother, personally received close to $100,000 in 2002. And this does not even begin to account for all of the funds transferred to businesses in which the Midland Entities held an interest, or in which friends or business colleagues of the Leichners were involved. In all, Lloyds wired millions of dollars to banks in other countries, including Israel, Switzerland, Estonia, Croatia, Cyprus, Bermuda, Singapore, Samoa, Antigua, Germany, Philippines, Hong Kong, Saudi Arabia, and Bahrain.

51.    The suspicious cash flow in and out of Lloyds did not go unnoticed by Lloyds. Lloyds had decided by June 3, 2000 to "monitor balances and transactions on a weekly basis" in light of the "the relatively high balances held [and] the impression that the dollar account will soon start to turnover relatively large sums of money." Indeed, the account was flagged as a potential cover for money laundering at this time – when there was just $449,928 in the dollar account.

52.    Lloyds investigated the account further in January 2002 as a result of suspicious account activity. On January 8, 2002, the Midland Entities deposited a total of $21 million from their California accounts into the Lloyds account. In the next few days, they transferred $5 million out of the Lloyds account to Defendant Man Financial and another $7.1 million to offshore accounts. As a result of this activity, a senior Lloyds representative investigated the companies. In addition to the usual questions regarding the potential that an account is laundering money, he also inquired as to the effect of the NFA suspension. He concluded that this was "not a [money-laundering] issue," but did not make any conclusions about what was actually going on if it were not a money-laundering issue or even explain how he determined that it was not a money-laundering issue.

-17-

53.     Andrew Connors, Lloyds' senior manager who was primarily responsible for the Midland Entities' accounts, was also well aware of the cash flows and their problematic nature. On or around January 15, 2002, Mr. Connors also learned of the NFA's and CFTC's suspensions of the Midland Entities from a business associate of the Leichners, John Lee of Linden FX, and Mr. Connors confirmed this fact by going to the websites of those organizations. He memorialized his findings in a memorandum of the same date. He informed Lloyds that the charges related to the suspensions were that the Midland Entities had not disclosed two customer accounts which comprised a substantial portion of their business. Mr. Connors also informed Lloyds that the Midland Entities subsequently filed false financial reports that failed to reflect their liabilities accurately. Mr. Connors recognized that these suspensions constituted a "concern" and suggested that a report be sent to the Lloyds Group Audit.

54.     Mr. Connors's memorandum explained: "My primary concerns are that they appear to [be] making exceptional returns for their clients (makes me nervous) and that they deal with significant amounts of client monies with both small and large investors involved. They therefore need to be whiter than white. Finally, all their US accreditation relates to [MEI] for whom we operate accounts but most of their UK business now operates through [MEEI] which I assume is their operating account for their non-US business. *If they are not reinstated, or their legal council cannot provide me with significant comfort we have to consider whether this is a relationship we want at Commercial Banking.*"

55.     Mr. Connors was justified in feeling "nervous." As discussed above, and as Lloyds well knows, "exceptional returns" for clients and the commingling of "significant amounts of client monies with both small and large investors involved" are two hallmarks of a Ponzi scheme. These attributes were particularly glaring red flags given the Midland Entities' claims to be trading in the volatile FOREX market.

-18-

56.    Mr. Connors then contacted Moshe Leichner and the Midland Entities' attorney, Michael Cardenas, to discuss the NFA suspension on or around January 15, 2002. He memorialized this conversation in a second memorandum of the same date. In the memorandum, he stated that the Midland Entities were being restructured. MEI, the "company that has difficulties with the NFA," would wind down its business with Lloyds and move offshore to the West Indies," whereas MEEI would remain a Lloyds customer, but would only be used for the "aircraft, tourism and properties business" and *would not* be used for FOREX trading. Notwithstanding these explanations, Mr. Connors admitted that there were "certainly things that I still need to understand."

57.    The NFA and CFTC suspensions of the Midland Entities were not lifted, and Lloyds' concerns were never addressed. Nonetheless, Lloyds did not take any action with regard to the remaining MEEI account, which continued to be used as part of the Ponzi scheme. Millions of dollars continued to be moved into and out of the account, as Lloyds simply continued to knowingly assist the ongoing fraud.

58.    Indeed, in the spring of 2002, Lloyds provided letters of reference for the Midland Entities. For example, in April 2002, Lloyds wrote to the Bank of Nova Scotia, in Barbados, confirming that the Midland Entities had held accounts with Lloyds since 1999, and that "significant credit balances have been held." Lloyds wrote similar letters at the same time period to the Hypo Bank in Liechtenstein and RZB Bank Austria in Vienna, Austria. These efforts assisted the Leichners in spreading the Ponzi scheme to other financial institutions.

59.    At the same time that Lloyds was touting the Midland Entities to other financial institutions, another London bank had decided to end its relationship with the Midland Entities in light of the NFA suspension and the Midland Entities' failure to explain the suspension. In a letter dated April 23, 2002, the Compliance Officer of RZB of London requested that the Midland

-19-

Entities unwind all existing transactions.  She wrote: "I am sure you will appreciate that in the regulatory environment in which we work in this country, banks must make decisions out of an abundance of caution, even if such decisions result in the severing of business with one of our customers."

60.     By the summer of 2002, the Ponzi scheme was beginning to unravel, and it would have completely come apart without Lloyds' knowing assistance.

61.     In July 2002, the Federal Bureau of Investigation contacted Lloyds about the Midland Entities.  By that time, the FBI had learned that the Leichners had investors transfer millions of dollars into the Lloyds account and then used that money to buy properties and airplanes in the Leichners' names.  Plaintiffs allege, on information and belief, that the FBI shared these facts with Lloyds in or before July 2002.

62.     Moreover, an official at Saudi Hollandi Bank, in Riyadh, Saudi Arabia, contacted Lloyds during July 2002 because "[h]e was concerned that several of his customers were getting involved in deals of a 'peculiar' nature with Midland Euro."  The Lloyds representative who was contacted, Jon Steadman, looked into the issue and "had concerns" given the fact that the account was "very active" and held nearly $10 million.  He therefore further investigated Midland Euro and noted that Midland Euro had been suspended indefinitely from the CFTC and NFA due to the filing of false financial reports.  Mr. Steadman nonetheless concluded that "this does not necessarily prevent us from operating their account," and recommended that the manager of Banking Support "liaise with the account manager to ensure that he is fully conversant with this customer's business and that the Bank has satisfied itself as to the nature of that business."

63.     Money continued to pour into the Lloyds account, and Lloyds knowingly assisted the Midland Entities by continuing to permit the commingling of investor funds and the transfer of those funds out of the account in furtherance of the scheme.

64.    Lloyds was also directly contacted by at least one individual who represented certain investors in the Ponzi scheme. The individual, Dean G. Tanella, is the owner and president of Safe Harbor Capital Management ("Safe Harbor"). From in or around September 2001 to November 6, 2002, Mr. Tanella wired more than $40 million on behalf of Safe Harbor's clients directly to the Lloyds account. Between January 2002 and November 2002 *alone*, almost $38 million was wired into the account.

65.    Beginning in or around December 2002, Mr. Tanella made several requests of the Midland Entities that this money be returned. No money was returned. Eventually, after continuing to be met with silence from the Midland Entities, Mr. Tanella contacted Lloyds directly to inquire as to the location of the investment on behalf of Safe Harbor's clients. Moshe Leichner had asked Lloyds *not* to respond to Mr. Tanella's inquiries and, tellingly, Lloyds complied without question – despite the fact that Mr. Tanella had wired tens of millions of dollars to Lloyds on behalf of Safe Harbor's clients.

66.    Although Lloyds had the right, at any time, to follow RZB's lead and close the Midland account upon reasonable notice, it chose not to do so. Instead, Lloyds continued to do what it had done since the start of its relationship with the Leichners and the Midland Entities: nothing. Nothing, that is, but continue to assist the Leichners and the Midland Entities and to profit off the millions of dollars that had been wired to it.

67.    Lloyds did not voluntarily close the account at any time. It was only when the Midland Entities requested closure in March 2003 – after both Moshe and Zvi Leichner had been arrested on charges of wire fraud and money laundering, and after Lloyds had transferred all but a fraction of the millions of dollars out of the account – that Lloyds ended the relationship. On March 27, 2003, Lloyds closed the accounts and wired the remaining funds to the Midland Entities in the United States.

-21-

## Man Financial Knowingly Aided and Abetted by Transferring Money to a Barbados Account

68.     Prior to June 2001, the Midland Entities had foreign exchange trading accounts at a futures brokerage firm called Union CAL.  The Midland Entities used Union CAL to transfer at least approximately $589,795 to an offshore account of another Midland Entity, the Midland Group, in Barbados (the "Barbados Account").

69.     In or around June 2001, as part of acquiring various assets from Union CAL, Man Financial acquired the Midland Entities accounts, designated as account numbers U3032N and U3033N (the "Trading Accounts").  At all relevant times, the Midland Entities were the legal and beneficial owner of the Trading Accounts.  At all relevant times, Man Financial knew that the Midland Entities were managed from within California, and the Midland Entities communicated with Man Financial from within California.

70.     At all relevant times, the Midland Entities used the Trading Accounts in furtherance of the Ponzi scheme in order to engage in foreign currency trades that would create an aura of legitimacy to the Ponzi scheme and that would permit the Midland Entities to market themselves falsely as successful foreign currency traders.  The Midland Entities also utilized the Trading Accounts to move victims' funds offshore.  In all, the Midland Entities transferred at least $6.5 million into the Trading Accounts between July 25, 2001 to January 9, 2002.  By the time the account was closed, on April 7, 2003, just $104,633 remained.  Man was therefore instrumental in assisting the Midland Entities in moving victims' funds offshore in an amount of as much as $6.4 million.

71.     For instance, during approximately September 2001 to February 2002, Man Financial transferred approximately $382,215 from MEEI's Trading Account into the Barbados Account.  These included deposits of $177,215.86 on

Fourth Amended Complaint - final.doc                    [PROPOSED] FOURTH AMENDED CLASS ACTION COMPLAINT

September 20, 2001; $123,000.00 on November 21, 2001; and $82,000.00 on February 15, 2002.

72.     Man Financial did not record those payments on the customer statements of the Trading Account that Man Financial provided to MEEI. There was no record at all of the $177,215.86 deposit on the September 2001 statement, and the other two payments were misleadingly listed as "Cash Paid," without identifying the Barbados bank entity. Plaintiffs are informed and believe that Man Financial knew that MEEI did not want the customer statements of the Trading Accounts to reflect the fraudulent transfer of funds of MEEI to the Barbados Account.

73.     In or around November 2001, Man Financial learned of the NFA's regulatory proceeding against and suspension of the Midland Entities.

74.     Man Financial nonetheless accepted money from the Midland Entities and executed trades of at least $5 million for MEI between November 2001 and January 2002.

75.     Shortly after Man Financial executed trades of at least $5 million, on or about January 16, 2002, Richard Seaman, Man Financial's Director of Compliance, wrote to the Midland Entities' attorney, Michael Cardenas. Mr. Seaman stated that Man Financial would from that time forward "accept liquidation orders only until this matter with the NFA is resolved." Liquidation orders are foreign currency trades made solely for the purpose of liquidating previously held positions.

76.     Mr. Seaman further wrote: "As you are no[] doubt aware, Man Financial has substantial business both through its offices in the United States and in the UK and it is company policy that where an omnibus account is involved then we will only deal with appropriately regulated companies. This requirement is being compromised by virtue of your current regulatory status in the USA."

Fourth Amended Complaint - final.doc          [PROPOSED] FOURTH AMENDED CLASS ACTION COMPLAINT

77.    An "omnibus account," to which Mr. Seaman referred, is an account that one futures commission merchant (here, Man Financial, as the "holding FCM") carries for another (here, the Midland Entities) in which the transactions of *multiple individual account holders*, who are not revealed to the holding FCM, are combined.  In other words, an omnibus account commingles the funds of investors – a hallmark of a Ponzi scheme, as Man Financial well knows.

78.    Although it was Man Financial's stated policy *not* to deal with a client that commingled client funds and had no accreditation, Man Financial did not want to lose the business – and profits – that the Midland Entities brought to them.  The Midland Entities worked primarily with two Man Financial traders, who had followed the account from Union CAL to Man Financial.  One of those traders, Duncan Dunn, emailed Mr. Seaman after learning of his orders regarding the Midland Entities' accounts.  In that email, dated January 16, 2002, Mr. Dunn asked for Mr. Seaman's "thoughts on how to help [the Midland Entities] get back into the fold," noting that "[o]bviously if there is a revised structure that you think would be appropriate, it would a massive result for us."

79.    Despite Mr. Seaman's statements that Man Financial would only accept liquidation orders after January 15, 2002, new trades continued to be conducted in the Midland Euro account at Man Financial between February 2002 and March 2003.  The transactions at issue involved foreign-exchange trades in the dollar-yen, dollar-British pound, dollar-euro, euro-yen, and dollar-Swiss franc.  The transactions typically involved anywhere from $5 million to $20 million, or its foreign currency equivalent.  These were *not* liquidation orders.

80.    Plaintiffs are informed and believe and therefore allege that Man Financial bent its rules to "help" the Midland Entities "get back into the fold," so that Man Financial could continue to obtain "massive results" from the Midland Entities and the Leichners, despite its knowledge of the NFA and CFTC suspensions and the facts underlying those suspensions.

-24-

81.    Plaintiffs are further informed and believe that Man Financial knew of the Midland Entities' fraudulent activities. Despite knowing of the Midland Entities' serious and substantial legal and financial problems, as well as their fraudulent activities, Man Financial decided to continue to do business with the Midland Entities through its Trading Account in order to generate profits for Man Financial by conducting principal-to-principal foreign currency trades for the Midland Entities, whose Trading Account had a substantial unencumbered equity. In furtherance of the Ponzi scheme and using commingled proceeds of that scheme, the Midland Entities transferred funds from the Trading Account to Man Financial in payment of amounts owed by the Midland Entities to Man Financial as the result of foreign currency trades between the Midland Entities and Man Financial.

82.    Man Financial continued to assist the Midland Entities until April 3, 2003, at which time it informed the Midland Entities that it would no longer accept foreign currency trades. This was more than a year after Mr. Seaman had originally threatened to stop trading with Midland Entities, and after almost $6.5 million in victims' funds had been squandered, lost, or moved offshore.

**Kaplan Prepared Fraudulent Financial Statements, Perpetuating the Scheme**

83.    Beginning in or about early 2000, MEI and MEEI employed Kaplan, which was then named Kaplan & Swicker, to provide accounting services. Kaplan audited MEI and compiled balance sheets for MEEI.

84.    During 2000, Kaplan learned from representatives of the Midland Entities, including Moshe Leichner and Michael Cardenas, that the Midland Entities were purportedly in the business of investing in foreign currency and that MEI was a member of the NFA. Kaplan further learned that the NFA was a self-regulatory agency that is similar to the NASD and that, among other things, it seeks to prevent fraud on investors.

-25-

85.     During 2000, Kaplan was also told that MEI would provide copies of its financial statements to Kaplan.

86.     On or about January 31, 2001, Kaplan learned from Michael Cardenas that the NFA was conducting an audit of the Midland Entities.

87.     In August 2001, Howard Friedman, the former owner of DFS who continued to serve as a consultant to the Midland Entities, warned Kaplan that the Midland Entities were not complying with its internal control systems and the Midland Entities were not sending customer statements as required by NFA regulations.

88.     On or about November 19 or 20, 2001, Moshe Leichner and Michael Cardenas had one or more discussions with Kaplan representatives.  Kaplan learned no later than that time that the NFA had "closed [MEI] down" to protect MEI's customers.

89.     Kaplan was told that the "primary reason" for the NFA's action was that Al Baraka had threatened a $16 million lawsuit against the Midland Entities, and that there was a dispute among the Association, the Midland Entities, and Al Baraka concerning whether Al Baraka's investors were customers of MEI (as alleged by Al Baraka and the Association) or MEEI (as alleged by the Midland Entities).  This dispute hinged in large part on whether MEI and MEEI were truly separate entities as claimed by the Midland Entities.

90.     Kaplan also was aware by that time that, as of January 15, 2001, MEEI had purported to transfer all but 15 of its customer accounts to an offshore affiliate, the Midland Exchange Group, in Barbados, in a transaction that, according to Kaplan's workpapers, "did not make sense" because "[i]f Midland Euro is giving up clients, they need to get something in return."  Kaplan valued the total loss to MEEI at approximately $7.6 million.

91.     Further, as noted in a Kaplan memorandum dated November 20, 2001, "there were several accounts in the name of [MEI] that belonged to [MEEI],

-26-

and other accounts in the name of [MEEI] that belonged to [MEI]." The November 20, 2001 memo continued: "We had treated these as nominee accounts in the past for financial statement purposes, but the documentation absolutely has to be cleaned up on these accounts before the NFA will allow [MEI] to open."

92. The "nominee" accounts referred to in the memo were bank accounts (a) in the name of MEI but were treated as an asset of MEEI, rather than of MEI, for financial statement purposes, and/or (b) in the name of MEEI but were treated as an asset of MEI, rather than of MEEI, for financial statement purposes.

93. As of November 20, 2001, Kaplan made the conscious decision that the accounting documentation of MEI for the "nominee" accounts could be somehow "cleaned up" and adjusted to separate and reflect which accounts belonged to MEI and which belonged to MEEI. In reality, the accounting documentation of these accounts could not be cleaned up. The true facts were that, under the management of the Leichners, MEI and MEEI did not have a separate existence and had commingled their funds and financial affairs, and Kaplan was aware of these facts.

94. No later than November 20, 2001, Kaplan was aware that MEI and MEEI had commingled their business affairs and lacked true separateness in that: (a) Kaplan knew that MEI and MEEI had nominee bank accounts as described above; (b) Kaplan knew that MEI and MEEI had engaged in substantial and material inter-company borrowing and/or transfers; (c) Kaplan knew that all of the Midland Entities, including MEI and MEEI, were defendants in a multi-million dollar lawsuit by Al Baraka alleging claims that threatened the solvency of MEI and MEEI and that had resulted in a preliminary injunction against both MEI and MEEI, notwithstanding allegations by the Midland Entities that Al Baraka had claims only against MEEI, not MEI; and (d) Kaplan knew that MEI and MEEI had common ownership and management, consisting of the Leichners.

-27-

95.    On or about December 20, 2001, Mr. Cardenas sent a letter to the NFA in which he alleged that the issues concerning the "nominee" bank accounts had been "identified, catalogued and repaired." Kaplan received a copy of that letter in or around December 2001. By letter dated December 26, 2001, the NFA notified Mr. Cardenas that he had provided "false information" to the NFA and that it did not trust him to provide accurate information. Kaplan received a copy of that letter in or around December 2001. Further, Kaplan knew Cardenas' statements were false because it was aware that the "nominee" bank accounts had not been "identified, catalogued and repaired" as Cardenas claimed.

96.    In an internal memorandum dated February 16, 2002, a Kaplan employee documented three regulatory actions in which the Midland Entities were embroiled, including a December 31, 2001 action alleging that the Midland Entities and Zvi Leichner had submitted materially false information to the NFA. The memorandum concluded that "I think the situation is not going to get better for Midland . . . . I think stepping down the engagement to a compilation is a good idea."

97.    These conclusions were crossed out with a pen at some point after the memorandum was written. Beside the crossed-out conclusions was a handwritten note, dated April 24, 2002, that stated: "ISSUES RESOLVED."

98.    While someone at Kaplan sought to claim that these "issues" had been "resolved" to the satisfaction of Kaplan, in fact the overarching fraud continued unabated – and with Kaplan's assistance.

99.    From approximately November 2001 to May 2002, Kaplan audited MEI's financial statements. In the course of its audits, Kaplan did not investigate the separateness of MEI and MEEI, and did not investigate the existence of commingling of investor funds in the "nominee" bank accounts of MEI and MEEI, despite having knowledge of the Midland Entities' fraudulent conduct in this regard.

100.   In or about May 2002, Kaplan certified its audit of MEI's financial statements for the year ending December 31, 2001, and provided those financial statements to MEI to give to the NFA.  Those financial statements were false and misleading in that they failed to disclose that MEI was committing a fraud on investors and was involved in a Ponzi scheme.  Although the financial statements noted that MEI lacked certain internal controls, the financial statements falsely reported that MEI's management was taking corrective actions when, in fact, MEI's management was continuing to commingle and divert investor funds and was continuing the Ponzi scheme.

101.   During 2002, Kaplan performed additional tax and/or accounting services for the Midland Entities and affiliated entities, including Bonanza Realty, Inc. and American Realty Group, Inc.

102.   Following November 19, 2001, and continuing through 2003, the Midland Entities continued to operate their Ponzi scheme and to raise, commingle and dissipate millions of dollars of investors' funds. The knowingly deficient audit performed by Kaplan materially prolonged and assisted the Ponzi scheme.

103.   Kaplan also played a role in assuaging the concerns of Dean Tanella, the owner and president of Safe Harbor.  Mr. Tanella became anxious about the status of the investment he made on behalf of Safe Harbor's clients and requested of the Midland Entities that this investment be placed in accounts bearing Safe Harbor's name, rather than that of the Midland Entities.

104.   Zvi Leichner told him that the Midland Entities were unable to do so, but offered to have the Midland Entities' "independent auditor" (which he later identified as Kaplan) provide a certified balance of the Safe Harbor account on a quarterly and annual basis.

105.   At some point, Mr. Tanella's accountant spoke with Kaplan directly, and Kaplan's comments apparently reassured the accountant.  After further communications with Zvi Leichner, in which Mr. Tanella was assured that he

-29-

would receive certified statements of the Safe Harbor account, Mr. Tanella agreed not to withdraw funds he had already wired on behalf of Safe Harbor's clients to Lloyds and to invest more funds with the Midland Entities.  Along the same lines, the Midland Entities touted Kaplan as one of their due diligence references.

**The Scheme Is Uncovered**

106.  On or about February 8, 2003, the FBI arrested the Leichners, and the fraudulent and criminal nature of their conduct became publicly known for the first time.  As is typical in any Ponzi scheme, the Leichners actively concealed the fraudulent nature of their activities until their arrest, so that Plaintiffs and other investors would not know that they were the victims of a Ponzi scheme.  In or about June 2003, the Leichners signed plea agreements and thereafter pleaded guilty to felony charges of wire fraud and money laundering in a criminal case entitled *United States v. Moshe Leichner*, U.S.D.C. No. CR 03-568, in the United States District Court for the Central District of California.  On or about February 28, 2005, Moshe Leichner was sentenced to a 20-year prison term.  On May 23, 2005, Zvi Leichner was sentenced to a 135-month prison term.

107.  Plaintiffs could not have known before the Leichners were arrested that they had even been the victims of a fraud.  And even after the Leichners were arrested, Plaintiffs could not have known that Defendants had played a *knowing* role in the fraud.  Defendants also fraudulently concealed their involvement in the Ponzi scheme from Plaintiffs.

## SPECIFIC ALLEGATIONS

### Count I:  Aiding and Abetting Breach of Fiduciary Duty

**(Brought by all Plaintiffs, including the Class Representatives, in Their Individual and Representative Capacities on Behalf of the Class Members, Against All Defendants.)**

108.   Plaintiffs hereby incorporate by reference paragraphs 1 through 107.

109.   Zvi and Moshe Leichner and the Midland Entities were investment advisors and owed the Plaintiffs, who were in effect their clients, fiduciary duties. The Leichners and the Midland Entities breached the fiduciary duties they owed to all of the Plaintiffs as described above.

110.   The Defendants at all material times had actual knowledge of the Leichners' and the Midland Entities' fiduciary duties to Plaintiffs with respect to Plaintiffs' investments and the manner in which those investments were treated by the Leichners and the Midland Entities.  The Defendants at all material times knew that the Leichners and the Midland Entities were violating their fiduciary duties to their clients, and actively participated in the operation of their Ponzi scheme.  In acting and failing to act as alleged above, the Defendants activity and affirmatively assisted in the Ponzi scheme and helped conceal it.  The Defendants enabled the fraud and theft to flourish and stay hidden from its victims.

111.   Without the Defendants' aid, the Ponzi scheme would not have grown as large nor become as pernicious as it did, nor would it have lasted nearly as long as it lasted.

112.   The Defendants substantially assisted and aided and abetted the Leichners' and the Midland Entities' breaches of fiduciary duties for their own financial gain.  Each Defendant was paid by the Leichners and the Midland Entities for assisting them in the perpetration of their scam.  The businesses of Lloyds and Man Financial increased in value because of their participation in the

-31-

scam.  Kaplan earned large fees for its work on all of the Midland Entities'
accounts.

113.   As a proximate result of the Defendants' conduct, Plaintiffs,
including the Class Representatives and the Class Members, suffered damages in
an amount not currently known but believed to exceed $90,000,000.

114.   The Defendants' actions were malicious, fraudulent, oppressive, and
intended to injure the Plaintiffs.  Consequently, Plaintiffs are entitled to punitive
damages.

## Count II:  Aiding And Abetting Fraud

**(Brought by all Plaintiffs including the Class Representatives, in Their
Individual and Representative Capacities on Behalf of Class Members,
Against All Defendants.)**

115.   Plaintiffs hereby incorporate by reference paragraphs 1 through 114.

116.   The Leichners and the Midland Entities intentionally defrauded every
Plaintiff, Class Representative and Class Member.

117.   The Defendants substantially assisted and aided and abetted the
Leichners' and the Midland Entities' fraud.  The Defendants knew that the
Leichners and the Midland Entities were engaging in fraud and willingly provided
their assistance to the Leichners and the Midland Entities for their own financial
gain as detailed above.

118.   As a proximate result of the Defendants' conduct, Plaintiffs suffered
damages in an amount not currently known but believed to exceed $90,000,000.

119.   The Defendants' actions were malicious, fraudulent, oppressive, and
intended to injure the Plaintiffs.  Consequently, Plaintiffs are entitled to punitive
damages.

**Count III:  Violation of California Business and Professions Code**

**§§ 17200 *et seq.***

**(Brought by all Plaintiffs including the Class Representatives,**

**in Their Individual and Representative Capacities, and the Class**

**Members Against All Defendants.)**

120.   Plaintiffs hereby incorporate by reference paragraphs 1 through 119.

121.   As described in the General Allegations above, Defendants participated in and perpetuated a Ponzi scheme by engaging in acts that include, but are not limited to:

      (a)   Lloyds accepted millions of dollars in investors' funds, commingled these funds into several accounts at Lloyds, wired funds out to investors as purported "profits," and lulled investors into a false sense of security.  Lloyds wired investors' funds from two of its accounts under regulatory scrutiny to offshore accounts belonging to the Leichners and their business associates.  Lloyds affirmatively provided letters of reference for the Midland Entities, assisting the Leichners in spreading the Ponzi scheme to other financial institutions.  And in response to a request by one of the Leichners, Lloyds refused to respond to the inquiries of one individual, Mr. Tanella, who had deposited millions of dollars of his clients' money into the Leichners' accounts at Lloyds and who was attempting to recover the money;

      (b)   Man Financial used its status as a legitimate broker in the foreign currency trade to accept millions of dollars in funds from Midland Entities, to commingle the funds in an omnibus account, and to execute trades on their behalf.  Man Financial also assisted the Leichners in moving investors' funds to an

-33-

offshore account and deliberately failing to register these transfers on the account statements sent to Leichners; and

(c)    Kaplan audited and certified financial statements for the Midland Entities that contained materially false statements. Kaplan was aware that the financial statements would be submitted to the regulatory agency which had previously suspended the Midland Entities, and that they were intended to get the regulatory agency to lift the sanctions.  In addition, at the behest of one of the Leichners, Kaplan affirmatively spoke with and reassured Mr. Tanella's accountant.  As a result, Mr. Tanella did not seek to withdraw millions of dollars that Safe Harbor's clients had already invested in the Ponzi scheme and invested tens of millions more on behalf of Safe Harbor's clients.

122.    Defendants' actions constitute unlawful business acts or practices within the meaning of Cal. Bus. & Prof. Code §§ 17200 *et seq.* on the grounds that:

(a)    Defendants substantially assisted and aided and abetted the Leichners' and the Midland Entities' breaches of fiduciary duty in violation of California common law;

(b)    Defendants substantially assisted and aided and abetted the Leichners' and the Midland Entities' fraud in violation of California common law;

(c)    Defendants knowingly and willfully conspired and agreed among themselves to form and operate, or later joined the ongoing conspiracy and fully ratified all past actions and the purpose of, the Ponzi scheme in violation of California common law;

-34-

(d)     Defendants participated, directly and indirectly, in the conduct of the affairs of the Midland Enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c);

(e)     Defendants engaged in acts of mail and wire fraud in violation of 18 U.S.C. §§ 1341 & 1343; and

(f)     Kaplan issued a report which failed to conform to professional standards upon completion of its review and audit of the Midland Entities' financial statements in violation of Cal. Bus. & Prof. Code § 5062.

123.    Defendants' actions constitute fraudulent business acts or practices within the meaning of Cal. Bus. & Prof. Code §§ 17200 *et seq.* Defendants participated in a Ponzi scheme intended to mislead investors, as described in the General Allegations, that is a *per se* fraudulent business practice. Defendants also engaged in specific misrepresentations and misleading statements, in conformity to and in furtherance of the Ponzi scheme.

124.    Accordingly, Plaintiffs may obtain all remedies and penalties authorized by the statute, including without limitation restitution, disgorgement, and other penalties for each illegal or fraudulent business act or practice, and attorneys' fees pursuant to statute and the Court's equitable powers, in an amount subject to proof.

## Count IV: Violation of 18 U.S.C. § 1961 *et seq.* (RICO)
### (Brought by all Plaintiffs including the Class Representatives, in Their Individual and Representative Capacities, and the Class Members Against All Defendants.)

125.    Plaintiffs hereby incorporate by reference paragraphs 1 through 124.

126.    Each of the Defendants is a "person" within the meaning of that term as used in 18 U.S.C. § 1962(c).

-35-

127. At all times relevant to this complaint, Lloyds, Man Financial, Kaplan, the Leichners, and the Midland Entities collectively constituted an "enterprise" (the "Midland Enterprise") within the meaning of that term as used in 18 U.S.C. § 1962(c). As alleged above, a legitimate business – DFS – was infiltrated and overtaken for the purpose of the acts of racketeering activity alleged above. Plaintiffs are informed and believe that the Midland Enterprise is an ongoing association that functions as a continuing unit for the purposes of these acts of racketeering alleged above as well as for other purposes.

128. At all times relevant to this complaint, the aforesaid enterprise engaged in interstate commerce and the activities of the enterprise affected interstate commerce.

129. At all times relevant to this complaint, each of the Defendants was associated with the aforesaid enterprise.

130. Upon information and belief, and as described in the General Allegations above, each of the Defendants participated, directly and indirectly, in the conduct of the affairs of the aforesaid enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(c).

131. Upon information and belief, and as described in the General Allegations above, Defendants' racketeering activity consists of numerous related and continuous acts in violation of 18 U.S.C. § 1341 (mail fraud) and 18 U.S.C. § 1343 (wire fraud).

132. As described above, upon information and belief, Defendants attempted to commit and committed acts of mail fraud, as that term is defined in 18 U.S.C. § 1341, and wire fraud, as that term is defined in 18 U.S.C. § 1343, on numerous occasions, and committed these acts willfully or with actual knowledge of the illegal activities. These acts include, but are not limited to:

      (a)    The Leichners and the Midland Entities regularly used the U.S. postal service to mail false account statements to Plaintiffs and

[PROPOSED] FOURTH AMENDED CLASS ACTION COMPLAINT

regularly used the telephone to communicate false information to Plaintiffs. For instance, Mr. Gonzales received several such false statements in the mail, including two dated December 23, 2002, and January 6, 2003. The statements showed that Mr. Gonzales's account had increased in value from $140,000 to $170,129.61 by December 23, 2002, and to $170,183.92 by January 6, 2003. In fact, these figures were completely fabricated and false.

(b) Defendant Lloyds accepted numerous wired money transfers from as many as 90 percent of the investors who were duped. On numerous occasions, Lloyds wired the commingled funds to other corporations formed by the Leichners, to Man Financial, to offshore accounts, or to investors for purposes of lulling investors into thinking that they were receiving a return on their investments. Moreover, in a telephone call on or around the first week of January 2003, Lloyds refused to respond to Mr. Tanella's inquiries about the $40 million invested on behalf of Safe Harbor's clients.

(c) Defendant Man Financial received numerous wire transfers from the Leichners, the Midland Entities, and from Lloyds. Man Financial also on at least three occasions wired a total of approximately $382,215 from the Midland Entities' Trading Account into the Barbados Account. These transfers occurred in or around September 20, 2001, November 21, 2001, and February 14, 2002. Man Financial did not record those payments on the customer statements of the Trading Account that Man Financial provided to the MEEI. Plaintiffs are informed and believe that Man Financial knew and/or had

-37-

       notice that MEEI did not want the customer statements of the

       Trading Accounts to reflect the transfer of funds to the

       Barbados Account.

    (d)  Defendant Kaplan certified its audit of MEI's financial

       statements for the year ending December 31, 2001, and

       provided those financial statements to the Midland Entities to

       give to the NFA.  Those financial statements were false and

       misleading in that they failed to disclose that the Midland

       Entities were committing a fraud on investors and were

       involved in a Ponzi scheme.  Plaintiffs are informed and

       believe and therefore allege that these fraudulent financial

       statements were transmitted to the NFA by use of either the

       mail or electronic means.  In addition, Kaplan communicated

       by telephone with Mr. Tanella's accountant in an effort to lull

       Mr. Tanella into leaving the funds of Safe Harbor's clients in

       the Ponzi scheme and investing tens of millions more.

  133.  Upon information and belief, Defendants attempted to, conspired to and did affect commerce by said acts of mail fraud in violation of 18 U.S.C. § 1341 and wire fraud in violation of 18 U.S.C. § 1343.

  134.  Upon information and belief, Defendants' continuous and repeated violations of 18 U.S.C. § 1341 and 18 U.S.C. § 1343 constitute a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

  135.  Upon information and belief, Defendants' violations of 18 U.S.C. § 1341 and 18 U.S.C. § 1343 injured the Plaintiffs in that these acts aided, abetted, and perpetuated the Ponzi scheme.

  136.  By reason of the foregoing, the Plaintiffs have been, and will continue to be, injured in their business and property in an amount not currently known but

believed to exceed $90,000,000, as a direct result of Defendants' violations of 18

U.S.C. § 1962(c).

### Count V:  Civil Conspiracy

**(Brought by all Plaintiffs including the Class Representatives,**

**in Their Individual and Representative Capacities, and the Class**

**Members Against All Defendants.)**

137.   Plaintiffs hereby incorporate by reference paragraphs 1 through 136.

138.   Plaintiffs are informed and believe, and on that basis allege, that at all times herein mentioned, each of the Defendants was the agent and/or employee of each of the remaining Defendants, and in doing the things hereinafter alleged, was acting within the course and scope of such agency and/or employment, and that all Defendants acted at all times with knowledge of the actions of each of the remaining Defendants.

139.   As more fully set forth above, Plaintiffs allege on information and belief that, from approximately 1999 to 2003, Defendants Lloyds, Man Financial, and Kaplan, and each of them, knowingly and willfully conspired and agreed among themselves, or in the alternative, later joined the ongoing conspiracy and fully ratified all past actions and the purpose of the conspiracy and agreed, *inter alia*, as follows:

> (a)  To form the Enterprise alleged above and to set up a series entities to be known as the Midland Entities for the purpose of soliciting funds from small unsophisticated investors and defrauding such investors;
>
> (b)  To misappropriate and convert the monies invested by Plaintiffs in the Midland Entities;
>
> (c)  To defraud Plaintiffs of their investments and to breach duties owed to Plaintiffs; and

-39-

1      (d)  To derive other profits and benefits through the pattern of

2            racketeering activity and other fraud alleged above.

3      140.   Defendants, and each of them, did the acts and things alleged above

4  pursuant to, and in furtherance of, said conspiracy and above-alleged agreement.

5      141.   As alleged in more detail above, each of the Defendants furthered the

6  conspiracy by cooperating with, lending aid, money and encouragement to, and/or

7  ratifying and adopting the acts of each of the other Defendants.  Each of the

8  Defendants had knowledge not only of the actions of each of the other Defendants,

9  but also of the conspiracy itself and its unlawful and tortious purpose.  The last

10  overt act of the conspiracy is believed to have occurred no earlier than April 3,

11  2003, at which time Man Financial finally informed the Midland Entities that it

12  would no longer accept foreign currency trades.

13      142.   As a direct and proximate cause of said conspiracy, and the wrongful

14  acts alleged herein, Plaintiffs have suffered damages in an amount not currently

15  known but believed to exceed $90,000,000.

16      143.   The Defendants' actions were malicious, fraudulent, oppressive, and

17  intended to injure the Plaintiffs.  Consequently, Plaintiffs are entitled to punitive

18  damages.

19

20      **WHEREFORE**, Plaintiffs pray for judgment and relief as follows:

21      1.    Declaring that this lawsuit is properly maintainable as a class action

22  and certifying Plaintiffs Ralph Gonzales, Alisa King, Jeffrey King, and Emmett S.

23  Elliott, Jr., individually, and as representatives of the Class;

24      2.    For aiding and abetting breach of fiduciary duty, all Plaintiffs,

25  including the Class Representatives on behalf of Class Members, seek

26  compensatory damages in an amount to be proven at trial, but believed to exceed

27  $90,000,000, interest on that amount, and punitive damages pursuant to California

28  Code of Civil Procedure § 3294;

-40-

3.    For aiding and abetting fraud, all Plaintiffs, including the Class Representatives on behalf of Class Members, seek compensatory damages in an amount to be proven at trial, but believed to exceed $90,000,000, interest on that amount, and punitive damages pursuant to California Code of Civil Procedure § 3294;

4.    For violation of California Business and Professions Code §§ 17200 *et seq.*, all Plaintiffs, including the Class Representatives on behalf of Class Members, seek all remedies to which they are entitled under the statute, including without limitation restitution, disgorgement, and other penalties for each illegal or fraudulent business act or practice, and attorneys' fees pursuant to statute and the Court's equitable powers, in an amount subject to proof;

5.    For violation of 18 U.S.C. § 1961 *et seq.* (RICO), all Plaintiffs, including the Class Representatives on behalf of Class Members, seek compensatory damages in an amount to be proven at trial, but believed to exceed $90,000,000, trebling of those damages, interest on that amount, and punitive damages pursuant to California Code of Civil Procedure § 3294;

6.    For civil conspiracy, all Plaintiffs, including the Class Representatives on behalf of Class Members, seek compensatory damages in an amount to be proven at trial, but believed to exceed $90,000,000, interest on that amount, and punitive damages pursuant to California Code of Civil Procedure § 3294;

-41-

7.   Awarding Plaintiffs their costs and disbursements and reasonable allowances for attorneys fees, experts' fees, and expenses in connection with the litigation; and

8.   Granting such other and further relief as may be just and proper.

DATED: October 20, 2006

Respectfully submitted,

GIRARDI & KEESE

By _____
THOMAS V. GIRARDI
GRAHAM B. LIPPSMITH

CALDWELL, LESLIE, PROCTOR & PETTIT
A Professional Corporation

By _____
CHRISTOPHER G. CALDWELL

Attorneys for Plaintiffs RALPH GONZALES, ALISA KING, JEFFREY KING, EMMETT S. ELLIOTT, JR., and the PUTATIVE CLASS

00141600
[PROPOSED] FOURTH AMENDED CLASS ACTION COMPLAINT